IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION


UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
v.                               ) Criminal Case No.
                                 )     2:22cr47
PATRICK ADAMIAK,                 )
                                 )
            Defendant.           )


EXCERPT JURY TRIAL PROCEEDINGS
(Testimony of J. Bodell)

Norfolk, Virginia
October 20, 2022


BEFORE:    THE HONORABLE ARENDA WRIGHT ALLEN
           United States District Judge, and a Jury.


Appearances:

     OFFICE OF THE UNITED STATES ATTORNEY
          By: William Muhr
              Victoria Liu
              Counsel for the United States

     RULOFF, SWAIN, HADDAD, MORECOCK, TALBERT & WOODWARD, P.C.
          By: Lawrence H. Woodward, Jr.
     **-- and --**
     LAW OFFICE OF DAVID M. GOOD
          By: David M. Good
              Counsel for Defendant

I N D E X

WITNESS ON BEHALF
OF THE UNITED STATES:                                      Page

**JEFF BODELL**
Direct Examination by Ms. Liu.................... 3
Cross-Examination by Mr. Woodward............... 38
Redirect Examination by Ms. Liu................. 60
Recross Examination by Mr. Woodward............. 63

E X H I B I T S

Government's Exhibit No.                              Received

121                                                        10
70                                                         12
71                                                         16

P R O C E E D I N G S

(Excerpt as follows:)

* * *

THE COURT:  Okay.  Ms. Liu?

MS. LIU:  Your Honor, we're going to call FEO Jeffrey Bodell.

JEFF BODELL, having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LIU:

Q.   Good morning.

A.   Good morning.

Q.   Could you please state your name for the record, spelling your last?

THE COURT:  And before we start, sir, can you take off your mask so the jury can see your face?

THE WITNESS:  Yes.

THE COURT:  All right.  Thank you.

A.   My name's Jeff Bodell, B-o-d-e-l-l.

BY MS. LIU:

Q.   What is your occupation?

A.   I'm a Firearms Enforcement Officer with the ATF.

Q.   What do you do as a firearms enforcement officer?

A.   Firearms enforcement officers serve as the ATF's technical authority on firearms and ammunition.  Our primary duty is to

classify firearms under federal firearms laws.

Q. How long have you been an FEO with ATF?

A. I started in November of 2020.

Q. And prior to starting with ATF as an FEO, what other firearms experience do you have?

A. I attended Pennsylvania Gunsmith School where I, upon graduation I worked for a small gunsmithing shop for good, a year and a half, conducting general gunsmithing.

After that I worked for a semi-custom production bolt-action rifle company making rifles for a year and a half. And then after that I had my own gunsmithing business based out of my house.

And prior to that I was in the military where I received some firearms training and experience.

Q. What did you do in the military?

A. I was a military police officer in the Marine Reserves for six years.

Q. Could you briefly explain the kind of experience you had as a military police officer?

A. As a military police officer we have a wide range of mission capabilities, and with that came a wide range of firearms weapons systems that we were required to be proficient on. Beyond their standard M-16 or M4 rifle, received training on the M203 grenade launcher, various crew-served machine guns such as an M-240, the M-249, M2 50-caliber machine gun, the Mark

19, which a 40mm grenade launcher machine gun.  I was also --

attended a operator's course for called M-32A1 grenade launcher,

which is a six-shot revolving grenade launcher.  And had some

foreign weapons familiarization training I did while in the

military.

Q.    You mentioned the term "crew-served weapon".  Can you

explain that a little bit?

A.    Crew-served weapon is a weapon that's generally too large

for one person to operate and employ by themselves.  On the

smaller end, it would require maybe two people, one to operate

the weapon, and a second to do loading, point out targets, carry

ammunition.  On the higher end you have, could have two or three

people employed on one weapon system to transport it, deploy it

and operate it.

Q.    All right.  So you mentioned that you had a gunsmithing

business that you were involved in.  In that capacity, how

familiar did you become with firearms?

A.    To go back to the gunsmithing school, they taught us a

broad general knowledge, a good foundation of gunsmithing

knowledge that applies to a wide variety of firearms, because as

a general gunsmith, when you have your own business, you never

know what's going to come in the door.  You could be doing it

for 60 years and always encountering a new type of firearm.  So

you have to have a good understanding of how firearms work to

best service your customers and provide the product that they

require.

Q.   You mentioned you had customers.  I guess what were your interactions like with your customers?

A.   It was very broad.  Like I said, you never know what's going to come in the door.  Some people wanted a custom, one-of-a-kind firearm built that's just an image in their mind and you help them through the planning process and develop the firearm so you can make a finished product.  Other times it's as simple as somebody needs a sight put on their firearm so they can go deer hunting with to get food for the winter.  It's really a wide range of tasks that help people with their firearm needs.

Q.   So when you were gunsmithing as your profession, did you have any sort of licensing?

A.   I did.  The businesses I worked for that weren't my own were licensed by the federal government to be able to engage in the business of firearms, and when I had my own business I had the licensing under my name.

Q.   What kind of licenses were those?

A.   Federal Firearms License.  One that I worked for was a Type I, which is a dealer.  If you manufacture firearms it's a different license that's required, which is referred to as a Type VII, which I've held.

Q.   All right.  So since starting with the ATF how many firearms, approximately, have you examined?

A.   Thousands of firearms.  But for ones I have had signed criminal reports, approximately 250.  And then probably signed reports for the industry, approximately 50.  So 300 firearms correlating to the signed peer-reviewed physical reports.  But I've evaluated thousands of firearms.

Q.   And prior to your time with ATF, how many firearms would you say you encountered?

A.   It's hard to put a number on.  It would be in the thousands.

Q.   All right.  But starting with ATF only two years ago, you've already done like 300 examinations?

A.   Official classifications, yes.

Q.   In addition to classifications, have you done like tours of firearms facilities, museums, that kind of thing?

A.   Yes.  Being a firearms enforcement officer requires a very broad and detailed knowledge of firearms, including manufacturing process.  So I have toured various manufacturers, and was privileged enough to have some private one-on-one tours with the lead machinist at some of these places to go through each step of how a firearm is manufactured.  Unfortunately, COVID has kind of limited my capacity to conduct those tours.  But I've also gone through several firearms museums, including the Cody Firearms Museum, and I had a private tour of the Smithsonian's firearms collection.

Q.   How many firearms would you say are in those collections?

A.    Thousands.

MS. LIU:  Your Honor, at this time I'd like to admit Jeffrey Bodell as an expert on firearms identification and classification and compliance with the NFA.

THE COURT:  Any objection, Mr. Woodward?

MR. WOODWARD:  Your Honor, I have one voir dire question if I could.

THE COURT:  You can.

Can you wipe that down for Mr. Woodward, please, Ms. Liu?

MS. LIU:  Yes, Your Honor.

MR. WOODWARD:  I can stand back far enough.

THE COURT:  No, no, we stay with our procedures, Mr. Woodward.  You know me.

Thank you Ms. Liu.

MR. WOODWARD:  Good morning, sir.  My name is Larry Woodward and I represent Mr. Adamiak.

My question is have you ever testified as a witness, expert witness before?

THE WITNESS:  I have not.  This is my first time.

MR. WOODWARD:  This is your first time?

THE WITNESS:  Yes, sir.

MR. WOODWARD:  Okay.  Thank you.

That's the question I have.  I will handle the rest of my questions on cross-examination.

THE COURT:  All right.  And ladies and gentlemen, he is going to be offered as a firearms expert in the classification and identification of firearms as it relates to the National Firearms Act, and you give his testimony whatever weight you believe it deserves.

All right, ma'am, you can go back up.

BY MS. LIU:

Q.   All right.  So for this case, did you examine samples that were sent to you?

A.   Yes.  I examined 32 exhibits that were assigned to the case.

Q.   And did you examine some of the charged firearms in this case?

A.   I did.

Q.   And did you write a report documenting your methods and findings?

A.   I did yes.

Q.   There should be binder up there.  Could you look at what has previously been marked as Exhibit 121?

A.   What was that number again?

Q.   121.

A.   Is that going to be on the tab that's 121 or...

Q.   Yes.

A.   The binder goes up to 80.

Q.   The second binder.

If you could just take it out and look at each of the pages?

A.    I apologize, there's quite a few pages here.

Q.    No problem.

Do you recognize that document?

A.    Yes.

Q.    What is it?

A.    This is my report, No. 2022659JRB.

Q.    And is that a true and correct copy of your report?

A.    Yes.

MS. LIU:    At this time I'd like to admit Exhibit 121 into evidence and publish it to the jury.

THE COURT:    It will be admitted and published.

(Government's Exhibit No. 121 received in evidence.)

BY MS. LIU:

Q.    So generally when you receive a sample, what methods do you use to examine it?

A.    When I receive an exhibit, I photograph it to preserve it, and I attempt to identify the item, generally what it is, who made it, where it was made, and then I conduct a physical examination of the exhibit.

Depending on the type of item it is, measurements are taken, because measurements may affect the classification of the firearm.    I also inspect it for function and if it's safe to

test fire and if it will fire, and then I attempt to test fire the weapon if I believe it's safe to do so.

Q.   So let start.  We're just going to talk about the charged weapons right now.  We're going to start with the M79 40mm grenade launcher.  What methods did you use to examine this particular weapon?

A.   I identified the item -- just as soon as I saw it I visually knew what type of item I was going to be examining. Then took a few measurements, photographed it, conducted a function test on the item, sourced some ammunition and test-fired it, and after that I completed my report on, for that section on that item that I examined.

Q.   And for this item what was your conclusion about it?

A.   It's a destructive device under both the Gun Control Act and the National Firearms Act, and therefore it was a firearm under the Gun Control Act and a firearm under the National Firearms Act.

Q.   When you mentioned you test fire, if you can, do you always, do you, like, record that normally?

A.   No.  Very -- it's very unusual.

Q.   Did you record your test fire of this weapon?

A.   Yes.

MS. LIU:  All right.  If you could review -- I don't know if there's a way he can listen to sound, Your Honor?

MR. WOODWARD:  Your Honor, we -- they gave -- they got

some videos of test fires.  I don't want her to get hung up in the process.

THE COURT:  You know, we -- Paul and I have to hear you.

MR. WOODWARD:  I'm sorry, Your Honor.

She -- in terms of just -- she -- we are aware of the videos, and she doesn't need, in my -- to review them before they show them, if that is what she was trying to find a way.

THE COURT:  I don't know what -- is that what you are trying to do?

MS. LIU:  Yes, Your Honor, I was.

THE COURT:  Okay.  Well, you don't need to do it.

MS. LIU:  Thank you, Your Honor.

MR. WOODWARD:  We've got them and we've seen them.

MS. LIU:  Your Honor, at this time I'd like to admit Exhibit 70 and publish it to the jury.

THE COURT:  All right.  That will be admitted, and please publish.

(Government's Exhibit No. 70 received in evidence.)

(Video exhibit published.)

BY MS. LIU:

Q.  All right.  What happened in that video?

A.  I loaded a foam impact cartridge, a 40mm cartridge into the exhibit, closed the breach, pulled the trigger, and the exhibit

successfully expelled a projectile by the action of an explosive.

Q.   All right.  And just to go back on your opinion, like you did say that this was a firearm, correct?

A.   Yes.  It is a firearm and a destructive device.

Q.   And what kind of firearm or -- and destructive device is it?

A.   As defined under both the Gun Control Act and the National Firearms Act.

Q.   What type?

A.   Are you asking the model.

Q.   Yes.

A.   It's an M79 40mm grenade launcher.

Q.   Let's move on to what has been identified and charged as an M203.  Could you explain the process you went through to analyze that sample?

A.   Essentially the same process as the previous weapon: Photograph it, identify it, identify who made the weapon, where it was made, and took a few measurements.  In the case of a weapon like this, like the previous one, the measurement of the bore is part of the classification of what it is.

Q.   Why is that?

A.   Because destructive devices, there's several parts of the meaning of destructive device, but the one that's relevant is a weapon which has a bore over half of an inch in diameter, and a

40mm weapon has a bore perfectly 1.6 inches, which is much greater than 0.5-inch.

I then examined the functionality of the weapon.  I performed a function test to see if it would likely fire, and when it passed that I test fired the weapon on our test range.

Q.   As you mentioned before, you don't record every single test fire, right?

A.   No, it's pretty rare that we do.

Q.   Why did you record the M79 test fire?

A.   It was an unusual firearm that we don't normally shoot a whole lot of 40mm cartridges, and it seemed like it might be relevant.

Q.   You didn't record the M203 test fire?

A.   I don't believe I did.

Q.   So moving on to the RPG-7, can you explain your method for analyzing those?

A.   The RPG-7, it's a large weapon.  Unlike the other items I had that have barrels that are removable, the RPG-7, the tube itself is the weapon, and it has other parts attached to it. And it's a weapon that has a bore over half of an inch, so there's some measurements taken, identified where it was likely made.  And the primary part of my examination for the RPG-7s is if the weapon was destroyed or what stage of completion it was in.  And I found it was not destroyed, and I test-fired the RPG-7.

For the test fire we don't have explosive rounds, we don't have the ability to store those, and we have a small indoor range, so we can't fire those, but we do have a -- I say "we" -- our office, we're in charge of the National Firearms Collection, which is approximately 12,000 firearms, and in there we had an RPG training device which simulates the loading and firing of an RPG-7 using a rifle cartridge.  So I utilized that device to test fire the RPG-7s during my examination.

Q.    You mentioned it's like a RPG training device.  Who would be training on that?

A.    Military members.  Soldiers.  Same thing, similar thing that we would have in our military.  I've personally fired training AT4s, which is our version, our antitank shoulder-fired rocket that uses a 9mm cartridge.  A single 9mm pistol cartridge or rifle cartridge is much cheaper than an explosive rocket, and there's health issues that correlate to firing rockets.  So it's better logistically to train people using something that's cheaper and easy to shoot.  But it simulates firing the real munition, the explosive munition.

Q.    Something that fires this training device would then function, be able to fire a real rocket?

A.    Yes.  I was able to load the training device.  I was able to fire the training device.  If the weapon was destroyed, I wouldn't have been able to do any of that.

Q.    And did you record your test fire for this device?

A.    Yes.

MS. LIU:  I'd like to admit what's been marked as Exhibit 71 and publish it to the jury.

THE COURT:  It will be admitted and published.

MS. LIU:  Thank you.

(Government's Exhibit No. 71 received in evidence.)

(Video exhibit published.)

BY MS. LIU:

Q.   What is your conclusion about this RPG-7?  Or both of them, I guess?

A.   They're both destructive devices and they're both firearms under both definitions found in the Gun Control Act and the National Firearms Act.

Q.   Okay.  So now I'd like to turn to something kind of entirely different.  We're going to try not to make this too tedious, but I'm going to show you photos from the search warrant.  If you use your expertise to clarify what's depicted.

We'll start with Exhibit 33.  What is kind of this photo? And if you want to start with that center weapon?

A.   I examined the large black item in the photograph there. It's marketed as a replica submachine gun, specifically a Sten Mk II, which was a World War II British submachine gun.  My examination of that, I found it to be both a firearm under the Gun Control Act and a machine gun --

Paul L. McManus, RMR, FCRR Official Court Reporter

MR. WOODWARD:  Your Honor, I'm going to object to this.

THE COURT:  Okay.  Hold on one second.  You need to come to the podium.

Can you wipe that down real quick, please, Ms. Liu?

MR. WOODWARD:  Just do it from here?

THE COURT:  Will it be long, Mr. Woodward?

MR. WOODWARD:  Your Honor, this is not charged and it's not included in the exhibit that was admitted.

THE COURT:  Do you know what?  I can't hear you.

MR. WOODWARD:  Okay.

Yes, Your Honor.  My objection to this is relevancy. It's not a charged item.  It's not included in the exhibit that was admitted.  And the only thing he was identified in his expert designation to talk about was destructive devices, as I understand it.  So I, I don't know why his conclusions about items that are not part of the case would be relevant to the jury's consideration of the ones that are.  And that would be my objection.

THE COURT:  Ms. Liu?

MS. LIU:  Your Honor, he's been classified as a firearms classification and identification expert, and this, as he mentioned, was a firearm.  It is also a firearm that he identified, and these exhibits have all been admitted through Special Agent Hairston.

*J. Bodell - Direct - Liu*                                        18

THE COURT: All right. I agree. This is Government 33, it's already in, and he has the background and expertise to talk about it. And if there's any weaknesses in his testimony that can be brought out on cross-examination.

You can proceed.

MS. LIU: Thank Your Honor.

BY MS. LIU:

Q. All right. Go ahead.

A. Yes. The item there, I physically examined that in Martinsburg, West Virginia in our office. It's marketed as a replica. It's largely made out of zinc casting. It's not a real Sten Mk II submachine gun. But I was able to fire a live cartridge out of it in approximately 15 minutes utilizing a machine gun barrel and a machine gun bolt, and because of that, it's readily converted to be able to expel a projectile by action of an explosive and therefore it is a firearm.

That one particularly was made by a company in Spain called Denix in the 1970s. Our office has examined replicas made by them, but not this one. Generally they would be examined to see if they are a firearm and deemed whether they're importable or not. And because it incorporated machine gun design features and I was able to put a machine gun bolt in it and it has the same trigger mechanism as a machine gun, it is a machine gun under federal law. Like I said, I was able to fire that dummy gun essentially in 15 minutes with modification to the weapon.

Paul L. McManus, RMR, FCRR Official Court Reporter

*J. Bodell - Direct - Liu*                                                      19

Q.    You were able to fire something despite it being marked as a replica?

A.    Correct.

Q.    Is there anything else that's pictured in that photo that we haven't mentioned?

A.    There's various firearms parts.  At the top of the screen there's a tan-colored item that's either a grip housing or an unfinished frame of a firearm.  I did not personally examine that item.  Actually, there's a anodized blue metal fixture in the center that's consistent with a fixture that's designed to allow somebody to complete the manufacturing processes of a unfinished AR-15 firearms receiver.

Q.    And how do you know that just from looking at the photo?

A.    I used those items when I was a gunsmith to manufacture firearms.

Q.    Let's move on to Exhibit 34.  What is that?

A.    That's an item that I examined in Martinsburg.  It's marketed as an Airsoft firearm, a toy.  My examination found that the left and the right side plates of the receiver are essentially a one-to-one copy of a real M-240 machine gun receiver, and they contain no blocking features to prohibit it from being a machine gun receiver.  So my finding was that that item incorporates the frame or receiver of a machine gun and it therefore is a machine gun as defined.

Q.    You mentioned blocking features.  What are blocking

features?

A.    Blocking features generally speaking are things done through a firearm to preclude it from being a machine gun.  And that's used for like semiautomatic versions of a design that is a machine gun.  So a company makes a machine gun first, and they take that same basic design and they want to sell it as a semiautomatic firearm for commercial sales, they must include features that prohibit it from using unmodified machine gun bolt or unmodified machine gun trigger mechanisms.  Because there's such a wide variety of firearms out there, the blocking features are different for every one of them.  We don't -- the ATF doesn't give schematics or plans or blueprints, we give guidance.  The companies will submit the items to us and we'll determine if they're adequate.

Q.    But this particular weapon didn't have any blocking features?

A.    No.  It was like rough casting, pretty much a one-to-one copy of M-240 side plates and receiver.  So no blocking features, and it's reached a stage of completion where we recognize it to be the frame or receiver of a machine gun.

Q.    And what is the M-240?

A.    The M-240 is a belt-fed machine gun.  It's the U.S. military's general-purpose machine gun.

Q.    Let's move on to Exhibit 35.

      There are a lot of firearms in there, but anything stand

out to you?

A.    The item in the top center, that's an item I examined. It's a double-barreled -- or it was a double-barreled shotgun that had the barrel shortened and the stock cut off.  That's a firearm under the National Firearms Act.  It's a weapon made from a shotgun with barrels less than 18 inches or an overall length of less than 26 inches.

In the top left of the top shelf upside down there is a MAC-type firearm.

Q.    What's a MAC-type firearm?

A.    The MAC firearms, the M11s, the M10s, they were made by various companies in the '70s and '80s.  They started out as a machine gun.  They have morphed.  There's different semiautomatic versions.  I examined four MAC-type firearms that were recovered in the search warrant, and all four of the ones I examined were open-bolt MACs; they fired from an open bolt, and they had a fixed firing pin.  They did not shoot automatically and they weren't converted to shoot automatically, but they are machine guns because they're designed to shoot automatically. They incorporate machine gun design features, and that's something that the ATF ruled on publicly in 1982 and has been long-standing.

Q.    So you mentioned "open bolt".  Is there like a closed-bolt system?

A.    Yes.

*J. Bodell - Direct - Liu*                                             22

Q.    What's the difference?

A.    Open bolt is before you pull the trigger, the bolt is held to the rear, and when the firing is initiated, the bolt goes forward into battery, pushes a cartridge into the barrel and immediately fires it.  It's a design that's inherent to machine guns.

      Closed bolt would be the bolt's forward, the cartridge chambered, and when you pull the trigger and initiate the firing sequence, the firing pin's released or a hammer strikes a firing pin, it doesn't have a large mass moving forward, and it's firing instantly.  A bolt-action hunting rifle is a closed-bolt, locked-breach weapon system as opposed to an open-bolt.

Q.    Anything else in that photo?

A.    On the lower section up top, the picture is rather dark, but there's an M79 receiver assembly.

Q.    Is that the one that you analyzed?

A.    Examined, yes.

Q.    Examined.  Sorry.

A.    There's a wide variety of firearms in that safe.  There is a, like a pump-action, like, shotgun weapon on the back of that same shelf that doesn't have a stock on it.  If it did have a stock on it and it was under 26 inches, it would be an NFA firearm, but there's weapons that are sold in that configuration that have never had a stock on it that are over 26 inches and they would just be Gun Control Act firearms you could buy at a

gun shop pretty easily.

Q.   All right.  We can move on to Exhibit 36.

This is a picture of the same safe.  You don't have to analyze every single firearm in there, but just anything that sticks out to you?

A.   There is a MAC-type firearm in the kind of top center upside down.

Q.   Not there?

A.   To the right more.

Q.   Is that right?

A.   Yes.  That's...

I think that what you pictured first was the upper and lower assemblies for one weapon, because that -- that item there doesn't have the upper is assembly on it.  But that's the control part, the frame or receiver of the MAC-like firearm.

The screen's rather dark to see perfectly.

Q.   You also have the exhibits in the binder, so if it's a little bit easier to see...

A.   Is it numbered?

Q.   Yes.  So it might be --

A.   This one starts at 81.

Q.   Yes.  The first binder.  And we're on 36 right now.

A.   Yeah.  There's a wide variety of firearms pictured here, including some Uzis that I examined.  The Uzis that I examined were closed-bolt, semiautomatic firearms.

Q.    What's a Uzi?

A.    Traditionally it's a compact submachine gun designed by Israeli forces, but the ones I examined were not machine guns.

Q.    Because they were closed-bolt?

A.    And semiautomatic.

Q.    Okay.

A.    There's a wide variety the firearms in here.  Pistols, bolt-action rifles, semiautomatic-style rifles.

Q.    These are all legally acceptable to own, correct?

A.    If the person's allowed to own firearms.

Q.    All right.  Well, let's move on Exhibit 37.

      What is pictured here?

A.    There's two firearms on the right side.  They are bolt-action rifles, Soviet design, Mosin Nagant, one of the more common bolt-action rifles around the world.  The one on the right has a slightly different color stock, which indicates to me that it's likely either an M-44 carbine, a later version, or an M39 made by the Finns.  But they're bolt-action rifles.

Q.    All right.  Let's move on to the next exhibit, exhibit 38.

      What's pictured here?

A.    In the white binder is a MAC-type firearm.  The four that I examined were machine guns.

      The picture the left of the binder there are two M60 machine gun receivers.

Q.    Sorry, to the left of the binder, right?

A.    Correct.  To the left there's --

Q.    To the left --

A.    Those are M60 receivers, and on the right of the binder is an M60 receiver that's not attached together.  And also the trunnion for an M60.  And an M60 is a belt-fed machine gun that was popular by U.S. forces from the Vietnam era up to the early 2000s.

Q.    You mentioned the word "trunnion".  What's a trunnion?

A.    On traditional steel firearms that are machined from a block of steel, the front is threaded for the barrel to screw into, but as technology advanced, more firearms started to be made out of stamped sheet metal.  So you can't thread stamped sheet metal, so they would rivet or otherwise attach a trunnion which serves that purpose of attaching the barrel to the receiver.

Q.    Would you say the trunnion is like a critical part of a firearm?

A.    Yes.

Q.    Is it one of the areas that a person would have to destroy to destroy a firearm?

A.    To destroy a firearm the weapon needs to be completely crushed, melted or shredded.  If somebody does not have the means to do that, they can contact our office and we'll provide an alternative method of destruction on an individual basis.

A trunnion is not part of a receiver, but the receiver

section of a firearm would have to be one of the areas that's destroyed.  But every firearm is a little bit different, and those alternate destruction diagrams are very specific.

Q.   All right.  Let's move on to Exhibit 39.

     What's pictured here?

A.   That's a receiver of a Thompson submachine gun.  World War II vintage.

Q.   And is that the complete receiver or is it destroyed or how -- like why is it in two pieces?

A.   It's segmented in half cleanly.

Q.   Looking at that, is that a destroyed receiver?

A.   No, it's not destroyed.

Q.   All right.  Let's go to Exhibit 40.

     What's in that photo?

A.   That's the receiver of a PPS43 machine gun.  It's cut in half.

Q.   And is that receiver destroyed?

A.   No.

Q.   Go to Exhibit 41.

A.   What's depicted there?

     That is a receiver you have of a PPS43 machine gun.  Again, severed in half.

Q.   And is that destroyed?

A.   No.  That's a serviceable firearm receiver.

Q.   Go to Exhibit 42.  What is that?

*J. Bodell - Direct - Liu*                                          27

A.    That is a MG-42-type machine gun receiver.  It's a very high rate-of-fire machine gun that was designed by the Germans in World War II and used by various countries after that.

Q.    And is that destroyed?

A.    I examined that receiver and it was cleanly cut in half, it was not destroyed.

Q.    Go to Exhibit 43.  What's depicted there?

A.    That is a PPSH41 machine gun receiver.  That's the model predecessor to the PPS43.

Q.    And is that one cut?

A.    Yes.  The PPSH and PPS43s that I examined, they were all severed in half cleanly.

Q.    Is that one of the ones that you examined?

A.    Yes.

Q.    Is that destroyed?

A.    No.

Q.    Exhibit 44?  What's depicted in this photo.

A.    It's a -- sorry, there's lots of acronyms.

    An RPD, Soviet machine gun receiver.  It's severed in half, and there's other items pictured, but I can't identify the other pictures off of this photograph.

Q.    Sure.  Let's go to Exhibit 45.

A.    The item in the center, that is a PPS43 machine gun receiver that's severed in half at the ejection port, and the items on the bottom are parts for a M2 50-caliber heavy machine

*J. Bodell - Direct - Liu*    28

gun.

Q.    You said an M2 50-caliber?

A.    Yes.  A Browning M2 machine gun that shoots a large .50 caliber cartridge.

Q.    Okay.  Now let's go to Exhibit 51.

What's depicted here?

A.    Those are shields that would go in the front of a general-purpose machine gun that's mounted.

Q.    When you say a mounted machine gun, what do you mean by that?

A.    So a general-purpose machine gun, it's small enough where one or two people can carry it around the battlefield, but it's big enough where it can be mounted in a mount in a fixed, static position on a vehicle or in a tower or a boat or something like that.

Q.    All right.  Let's go to Exhibit 53.

Did you examine these items?

A.    I did not.

Q.    Do you know what's depicted?

A.    RPG-7 munitions.  I didn't examine them, I don't -- I don't deal with explosives.  I can't tell you if those are real or display pieces.

Q.    All right.  Exhibit 57, what's depicted here?

A.    Those are machine gun parts.  Those are -- the top cover is assembly for a belt-fed machine gun.

*J. Bodell - Direct - Liu*　　29

Q.   How does a top cover assembly work for a belt-fed machine gun?

A.   There's little pawls on the front section that -- there's the curved channel that you see, the silver section, there's a camming stud on top of the bolt, so when the bolt cycles it moves back and forth, it moves those pawls left and right and that's what feeds the next cartridge in the linked ammunition in line of the barrel so it can continue to fire.

Q.   You said it was for a belt-fed machine gun, right?

A.   A belt-fed weapon, yes.

Q.   All right.  Exhibit 58.  What's depicted here?

A.   That's a side plate for an M240 machine gun.  It's a .30 caliber, belt-fed weapon, and it's segmented by a torch.

Q.   Is this considered destroyed?

A.   I conducted a preliminary examination of this.  My finding so far is that it's not destroyed because it -- while it's torch-cut, it's not at the critical areas that we specify.  I've been discussing that item with other FEOs in my office about its ability to be readily restored, and that's the direction we're currently taking, but it's not a final determination.

Q.   So help the jury understand, like this doesn't look like a receiver that we've been talking about during this trial.  Why is this like potentially a machine gun?

A.   The other receivers, they're one component.  A box-type firearm that has plates on the sides and the bottoms and the

*J. Bodell - Direct - Liu*                                    30

top, the sides are the critical part there because the whole receiver is a conglomeration of parts, but one part needs to be regulated under the law.  And so generally it's the right side plate by and large which we consider a machine gun.

        If a machine gun is disassembled it still needs to be tracked.  So the box-type firearms, the side plates are the part that we regulate, solely the right side plate on most firearms to be consistent.

Q.   All right.  You've mentioned the word or the phrase box-type.

A.   Yes.

Q.   -- firearm.  Is the M-240 a box-type?

A.   Yes.  It uses large side plates that are rivetted together to form essentially a large rectangular box that houses the firing mechanisms.

Q.   All right.  Let's go to Exhibit 59.  What's depicted here?

A.   The items on the bottom, those are the side plates for an M-240 machine gun.  They reach this stage in manufacture in which we consider it to be the receiver of the machine gun, and they contain a blocking feature, so that item's pictured there, that is a machine gun because it's the receiver of a machine gun.

Q.   All right.  And just for clarification, what we saw on the previous photo it's like the same, like same kind of situation where it's like a side plate --

*J. Bodell - Direct - Liu*                                                   31

A.    Correct.

Q.    -- of the M-240?

A.    It's the same model, just not cut up.

Q.    Let's go to Exhibit 60.  What do you see in this photo?

A.    Those are MAC-type firearm receiver flats and the other parts for that.  In one of the boxes in the corner there's the rear sight component that would be added.  So it's one piece that would have to be folded to make the finished receiver.

Yeah, those are MAC-type firearm parts and receiver parts and MAC receiver flats.

Q.    And so you said it's one piece.  So each one of those flats would become a receiver if they were folded?

A.    Yes.  And if it's a -- if it has certain things done to it prior to being folded it could be a firearm receiver or a machine gun receiver.  If there's certain holes or cutouts for machine gun parts, it would be a machine gun prior to being folded.

Q.    So even in a flat form?

A.    Potentially, yes.

Q.    Let's go to 61.

What's depicted here?

A.    Those are, there are some of those one-piece flats we saw in the previous picture for a MAC-type firearm, but there's also three-piece MAC flats where it's the left and the right and a bottom.  They're simple to weld together.  The presence of the

sides and the bottom is a receiver whether it's assembled or not under the law.  If it's the side plates for a machine gun, then those would be machine gun receivers as well.

Q.   All right.  And you mentioned, like in this photo you see both that one piece and the three-piece.  One-piece is the one that kind of looks like maybe like an airplane?

A.   Airplane or human silhouette without arms or something like that.

Q.   If you look to your screen, the one that's highlighted, is that the one-piece?

A.   Yes, that's the one-piece.  Those get folded to be finished.

     And the three-piece there is simply welded together.

Q.   Let's go to Exhibit 62.  What's depicted in that?

A.   In the box that's the three-piece MAC-type receiver that we were just talking about fixed to an aluminum block.  And that's a welding fixture.  You use dissimilar metal, so easier to weld. That's a firearm receiver there.

Q.   Looking at this one, is this one already welded?

A.   No, but it's already reached the stage of -- the presence of those three items, whether it's welded or not, is enough to be a firearm receiver.  And that's been the ATF's stance since the 1980s when --

Q.   Was that --

A.   -- Industries was selling these items.

*J. Bodell - Direct - Liu*                                                    33

Q.   So it doesn't matter whether it's been welded or not?

A.   No, not for the three-piece receiver flats.

Q.   Okay.  And you previously mentioned that the jig is going to be like a dissimilar metal from the receiver.  Why is that?

A.   You use aluminum or another type of metal.  That's so you can weld the steel together without it welding on to the fixture.

Q.   So if it was the same metal there's a risk that the parts of the receiver would then attach to the jig itself?

A.   Yeah.  You wouldn't want to do it that way.  But having a block of aluminum would probably be easier than trying to hold it together with magnets, which is another common way to weld 90-degree angles.

Q.   Okay.  Now I'm going to turn to some physical exhibits which should be by your feet.  I'd like to start with Exhibit 46.

          COURT SECURITY OFFICER:  Is it paper or a weapon?

          MS. LIU:  It's paper.

          THE WITNESS:  What number?

          MS. LIU:  46.

          THE WITNESS:  Is it the item pictured on the screen?

BY MS. LIU:

Q.   Yes.  You can take it out and take a look.

     All right.  What are these items?

A.   These are MAC-type firearms:  M11-9.  They were like the

Ingram before.  It was owned by -- the companies that made MAC firearms, the company's changed names, renamed a couple times, but these are operating and maintenance manuals for these weapons, both the semiautomatic and the submachine gun versions as well as receiver plans for these firearms.  Blueprints for the MAC receivers.

Q.   All right.  So what do people -- what is the value of a blueprint?

A.   Blueprints are schematics to give you dimensions to be able to replicate something.  Additionally they're probably collectible documents.  Interesting to me.

Q.   All right.  You can put them back in the bag.

We're going to Exhibit 47.

What are those documents?

A.   One is an RPD Industries Incorporated catalog.  They're one of the manufacturers of the MAC firearms.  They sold their parts.  There's also a MAC -- a couple MAC firearm parts diagrams and a parts list.  Diagrams are helpful for disassembly and reassembly of a firearm so you know where components go.

Q.   Let's go to Exhibit 48.

I actually want you to look at the one that has the, I guess, diagram on it, because we heard testimony about the other part.

What is that diagram?

A.   It's instructions for drilling the side plates for a

*J. Bodell - Direct - Liu*                                    35

MAC-type firearm for the fire control components.  And the front hole is what holds it onto the receiver -- or the two assemblies together.  So it's instructions for completing a MAC firearm side plate.

Q.   Let's go to Exhibit 49.

All right.  What is that?

A.   It's a -- says Design Activity, U.S. Army for the M249 machine gun receiver.  It contains diagrams and blueprints for the machine gun receiver for the M249, which is a belt-fed machine gun the military uses.  It looks like it's a military document.

Q.   Let's go to Exhibit 50.

We've already heard testimony about this document for parts of it, but I want to draw your attention to the second-to-last paragraph that starts "Or if you can."  That paragraph.

A.   Okay.

Q.   What are FALPK parts?

A.   Full Auto Lower Parts Kits parts.  That would be talking about machine gun fire control components.  It could be as simple as M-16 parts, trigger and disconnector, the selector for an M-16.  The ATF does not regulate machine gun parts, we regulate firearms, so...

Q.   And if you look at the envelope, it's from like Slovenia.  Is there any regulation about transporting parts outside of the country?

*J. Bodell - Direct - Liu*                                        36

A.    Yes.  And to import firearms parts into the country we have a -- the ATF has an imports branch that specializes in that, and that's not necessarily my area of expertise, but there's an ATF Form 6 that's required for importation of firearms and firearms parts.  There are certain countries where you can't have firearms or firearms parts imported from, generally Soviet Bloc countries.

Q.    What's a Soviet Bloc country?

A.    Countries that were formerly part of the Soviet Union.

          MS. LIU:  Your Honor, can I have one second?

          THE COURT:  You may.

BY MS. LIU:

Q.    I'd like you to look at Exhibit 105.  Actually we're going to start with the second page.

     What is depicted here?

A.    My screen turned off.  105?

          COURTROOM DEPUTY CLERK:  It hasn't been admitted yet. I took it off.

          THE COURT:  It's not admitted yet.

          MS. LIU:  Your Honor, we showed this to Mr. Pruess.

          THE COURT:  I understand, but it wasn't admitted at that time.  Would you like to admit it?

          MS. LIU:  Yes, Your Honor.

          THE COURT:  Is there any objection?

          MR. WOODWARD:  Your Honor, we would have the same

objection as before on the other ones.  They did not -- I'm sorry -- they did not -- I'm sorry.

Have to wipe down.

Your Honor, this is not in evidence.  I believe it's subject to the same analysis that the Court's already ruled on, and I did not know they were going to show it, but it certainly was encompassed by that, would be my position.

THE COURT:  I think you're right, Mr. Woodward.  So Exhibit 105 hasn't been admitted for all the reasons I stated from 9 o'clock to 9:15 warrants us not allowing him to comment on that exhibit.

MR. WOODWARD:  I'm sorry, I didn't wipe down.

THE COURT:  I've got to keep everybody safe.  Can you wipe it down, please?

Thank you, Mr. Woodward.

MS. LIU:  All right.  Your Honor, at this time I don't have any further questions.

THE COURT:  All right.  And then I think -- is this going to be a long cross of this witness, Mr. Woodward?

MR. WOODWARD:  Relatively.  I'll be glad to take a break right now.

THE COURT:  Let's take our morning break now.

And Officer Bodell, please don't discuss your testimony with anybody.

We're going to take a 15-minute break.  We'll resume

at quarter to 11.

(Recess taken from 10:28 a.m. to 10:47 a.m.)

THE COURT:  All right.  Mr. Woodward.

MR. WOODWARD:  Thank you, Your Honor.  I'm going to try to do better and stay by the microphone.

THE COURT:  We appreciate it.

MR. WOODWARD:  Good morning, sir.

CROSS-EXAMINATION

BY MR. WOODWARD:

Q.   Good morning.  I introduced myself earlier.  My name's Larry Woodward.  I have some questions for you.

I first wanted to start a little bit with your background. You said at some point you operated a business out of your home at some point in your career?

A.   Yes.

Q.   And what kind of business was that?

A.   It was a gunsmithing business.  I was licensed as a firearms manufacturer.

Q.   And you ran that out of your home.  Did you have parts as part of that business?

A.   Firearm parts?

Q.   Firearm parts.  Gun parts.

A.   Yes.

Q.   Okay.  Because you needed parts to make the guns, right?

A.   Correct.  I didn't keep a working inventory; I would buy

items as I needed them for certain jobs.

Q.   Okay.  And I think you said near the end of your direct testimony the ATF doesn't regulate machine gun parts, that's correct?

A.   Not, not as firearms.  There are some regulations under importation, but that's the only exception.  There are some parts that are regulated, but that's as under the defined terms, if it's a weapon -- or a combination of parts designed and intended for use in converting a weapon into a machine gun, those combination of parts are a machine gun as opposed to parts for a machine gun.

Q.   Yes, sir.  I didn't ask you what a machine gun was.  I think I was -- I think in -- I wrote down that in your testimony with the United States Attorney right near the end you made the statement the ATF does not regulate machine gun parts.  Did I mishear that?

A.   No.  That's correct.

Q.   All right.  Thank you.

Let's now turn to Exhibit 121.  And I'm -- which is your -- been admitted as your report.

MR. WOODWARD:  And you if it can be put up on the screen?

BY MR. WOODWARD:

Q.   First of all, just in the structure of the report, under Exhibits you list six things that are part of the report,

*J. Bodell - Cross - Woodward*                                    40

correct?  Item 16, 23, 25, 30, 31 and 59; is that right?

A.    That's correct.

Q.    Okay.  Now, those numbers over there, the 16, 23, et cetera, are they numbers that you put or were they the numbers that were on the exhibits when you got them from the search?

A.    Those were the numbers that were on my work order which corresponded to the evidence tags.

Q.    Okay.  Evidence tag numbers.  Okay.

All right.  So let me ask you, no. 59 is not a charge in this case but it's on the report so I want to clarify, is that a short-barrel shotgun, that item?

A.    It's a short-barreled shotgun under the Gun Control Act.

Q.    And you understand that's not part of the charges in this case?  Or do you even know which ones are charged?

A.    That's correct, I understand it's not one of the charged weapons.

Q.    And I now want to start a little bit out of order.  Let's start with the Item 30 which is the one of the RPGs, and that begins -- or is on Page 5 of your report in the middle Exhibit 30.  If you got to page --

MR. WOODWARD:  Can we put Page 5 up on the screen?

BY MR. WOODWARD:

Q.    Is that right?  That's where you have your analysis of Exhibit 30?

A.    Yes, sir.

Paul L. McManus, RMR, FCRR Official Court Reporter

*J. Bodell - Cross - Woodward*                                                41

Q.   Okay.  And do you know when that item was manufactured?
Were you able to determine that?

A.   No.

Q.   You just found out, you know, it was made in Bulgaria.  Do
you know if it was a World War II era or do you know anything
about the manufacture or date of it?

A.   The fire control assembly indicates that the weapon was
made in Bulgaria, but that's a removable part so I wasn't able
to determine if the tube was made in Bulgaria, but RPG-7s began
production in approximately 1961.

Q.   So after World War II -- between World War II and Vietnam?

A.   And it's continued production.  It's still used in many
places around the world today.

Q.   And then I understand down there at the bottom Exhibit 30
was missing some of the firing mechanism components, correct?

A.   That's correct.

Q.   A firing pin wasn't in there.  What's the purpose of a
firing pin in a device?

A.   The firing pin transfers kinetic energy into a part to
ignite the explosive compound to start the initiation process.

Q.   Okay.  And you had to take from your inventory of parts at
the ATF a firing pin and put it in there, correct?

A.   Yes.  I gathered a complete fire control assembly from the
RPG-7 in the National Firearms Collection, attached that to the
exhibit, and I installed a firing pin also.

*J. Bodell - Cross - Woodward*                                                    42

Q.   So when you got it, when it came from the search warrant it didn't have a firing pin, right?

A.   That's correct.

Q.   All right.  Then you have a firing pin spring.  What is that?

A.   Just pushes back on the firing pin so it's not stuck protruding through the tube.

Q.   Did you have to get one of those out of your inventory?  I mean, that's part of what you put on it before you test fired it?

A.   The firing pin spring would not be necessary.  And to be completely honest, I don't remember if I used one or not.  I don't think I did, because I wanted to see the firing pin protrude for a photograph, and the spring would have pushed it back so it wouldn't have protruded.

Q.   So you fired it without the spring, but it didn't have a spring?

A.   I believe -- yes, it did not have a spring.

Q.   What about the main spring, what is that?

A.   The main sprain is a coil spring that, in conjunction with the next part, the main spring rod, provides kinetic energy for the hammer.

Q.   So it didn't have either one of those parts either?

A.   Correct --

Q.   You --

Paul L. McManus, RMR, FCRR Official Court Reporter

A.    -- I didn't receive those.

Q.    You hadn't received those, you got those when you got to West Virginia and stuck them on there before you fired it?

A.    That's correct.

Q.    Then a hammer.  What is the hammer?

A.    The hammer is the part that strikes the firing pin.

Q.    And did it have one of those?

A.    It did not.

Q.    So you took one and put it on there?

A.    I -- yes.  I used an entire fire control assembly and swapped them out.

Q.    So when you got it, it wouldn't fire without you putting the firing control assembly on there, correct?

A.    I could have fired the training device without those parts, but I chose to restore it to the way it's designed to be fired.

Q.    You say you could have but you didn't?

A.    Correct.

Q.    And the video that the ladies and gentlemen of the jury got shown was after you put all those parts on there?

A.    Yes.  That's the configuration the weapon was designed to be fired in.

Q.    Further on over on Page 6 of your reports, which is the next page down, in the last paragraph from the bottom you say -- or the last paragraph, I guess, where it starts "Exhibit 30 as received," that paragraph -- the jury will have this, but I just

want to clarify -- so you say there that you can install four commercially available parts it can be restored to firing condition.  I count in your list of things that it didn't have five parts:  The firing pin, the firing pin spring, the main spring, the main spring rod and the hammer.  So is that four parts or five parts?

A.    That's -- as stated earlier, the firing pin spring is not required for those components to interact with each other to fire the device.

Q.    Okay.  So when you say you list five but when you write four, you're excluding the firing pin spring --

A.    Yes.

Q.    -- as one of the four.

And those parts are commercially available where?

A.    Most firearms parts suppliers.  When I was a gunsmith I commonly used a company called Numrich for firearms parts.  I went on their website to see if they had RPG-7 parts available, they do, they are in stock.  The entire fire control assembly with the grip and the components inside of it at the time was about sixty dollars in stock.

Q.    So if somebody had this thing and had some desire to fire it or make it fireable, it would have been easy for them to go get those parts if they wanted to?

A.    Yes.  Or you could have just used a punch or a rusty nail and put it through the firing pin hole and struck it.  Wouldn't

have been ideal, but possible.

Q.   And you don't -- you don't, of course, know whether any of that happened with regard to my client or not, you just, you just know what it was like when you got it?

A.   I received the evidence that I -- I examined the evidence as I received it.

Q.   All right.  And I think without belaboring it, if you go to Exhibit 31 which kind of starts at the bottom, or starts -- excuse me, on Page 7 -- the same thing is true?  I don't need to go through them all again:  That one was missing all of the same devices or parts that we just talked about?

A.   Correct.  They were virtually identical weapons.

Q.   Right.  And you had to put, do the same thing to get that one to fire for your video, put that device you had up at your lab on there?

A.   I did, because I elected to test fire the device or the weapon.  The test firing of the weapon was not part of the classification.

Q.   And just so it's clear, going back to 30, we'll use that one, was there a hole cut in the top of that device?

A.   There's a very small hole.

Q.   And what --

A.   Do you know what page that was on?

Q.   Well, I'm trying to -- I know there's a hole cut into the top of it, I don't know that it was on any page.  But have you

got the device there by you?

A.    I do.  It's on the --

Q.    Have you got a picture?  Is there a picture in your report of the hole?

A.    Yes.  It's approximately 0.39 inches in diameter.

Q.    How many millimeters is that, do you know?

A.    I don't know millimeters.

Q.    But that's something that was drilled in there; it's not the way it would have come?

A.    Correct.

Q.    Just to be clear and fair to you, you don't know how this device, who had it, who bought it, how it got transferred to my client or how long he'd had it anything like that?

A.    No.

Q.    You just -- and that would be true for all of these devices:  You just know that you got them and you examined them?

A.    Correct.  I receive firearms and I examine and classify them.

Q.    Were you given as part -- you said you examined -- I think you told us you examined 32 things?  32 exhibits?

A.    Yes.

Q.    Were any of those exhibits that you examined this firing mechanism for the RPGs that you had at your lab?

A.    No.  They were suspected firearms.

Q.    Right.  So they didn't -- you didn't get like a firing

mechanism for this thing that you were led to believe came anywhere from my client's house during the search warrant?

A.   I did not.

Q.   Okay.  Then with regard to the M79 and the M203, you got those, snapped the barrel on and fired them, correct?  Or fired one of them?  Which one did you fire?

A.   I fired the M79 and I fired the M203 with the barrel that was part of that exhibit.  And I also had a second barrel assembly for the M203 that I put on the receiver.  So I fired three times.  Three configurations.

Q.   And the 40mm, the fact it's 40mm is what in the ATF's world makes it a destructive device, correct?

A.   The fact it has a bore over half of an inch and that it's a weapon makes it a destructive device.  The fact that it's a 40mm rifled bore for all three barrels, that's what makes a weapon, as opposed to a 37mm or a 38mm signaling device.

Q.   So you would agree that a 37 or 38mm barrel attached to those same receivers would not be a weapon as far as the ATF's concerned?

A.   If they did not contain rifling on the presence of antipersonnel ammunition.

Q.   And you don't know whether there were any of those kind of barrels in my client's place when it was searched that didn't get seized or didn't get sent to you?

A.   Are you talking about the signaling device barrels?

*J. Bodell - Cross - Woodward*                                    48

Q.    Barrels less than 40mms.  You didn't get any of those to examine?

A.    I did not.

Q.    Did you get the replica M79 receiver to examine?

A.    I did not.

Q.    Did you get a replica M203 to examine?

A.    I got an actual M203 receiver.

Q.    So the answer to my question is no --

A.    Correct.

Q.    -- you did not get one?

Do you know if those were in my client's home when the search was conducted?  Replicas?

A.    I do not.  I was not present during the search warrant.

Q.    And finally on that, you don't know where in terms of physical proximity or storage where the barrels you got were stored *vis-a-vis* where the receivers were?  You didn't conduct the search?

A.    No.  My examination was based on the exhibits I received as I received them.

Q.    Let's now go -- the United States asked you -- let me ask you a question though.  You all got 12,000 firearms up there, give or take, in your library or your --

A.    Approximately.

Q.    -- your stash?

Do you have a PPSH machine gun up there, do you know?

A.    Several.

Q.    Okay.  Do the Chinese make a gun that's similar to the PPSH to your knowledge?

A.    The Soviet government licensed other countries, their allies, to be able to produce firearms, and I believe the Chinese were one of the countries that made a licensed copy of the PPSH and PPS machine guns.

Q.    But you've got a real one up there that, if somebody had decided it was important to bring a PPSH down here to show this jury, they could have done that?

A.    Can you rephrase the -- or repeat the question?

Q.    That's all right.  I'll move on.

Let's go to Exhibit 33.

We're going -- you were asked about this, correct?

A.    Yes.

Q.    It's marketed as a replica, correct?

A.    Yes.

Q.    My client's not charged with it as far as you know, correct?

A.    That's correct.

Q.    Okay.  Let's go to Exhibit 34.

You said this is marketed as a toy, correct?

A.    Yes.

Q.    And my client's not charged with it so far as you know, correct?

*J. Bodell - Cross - Woodward*                                    50

A.    Correct.

Q.    Okay.  Those items to your knowledge, both 33 and 34, were seized and sent to you for analysis --

A.    Yes.

Q.    -- you examined those?

      Okay.  Let's go to 35.

      You pointed out in there a double-barreled shotgun.  Did you examine that item?

A.    I did.  The weapon made from a shotgun.

Q.    All right.  Client's not charged with it, correct?

A.    Correct.

Q.    Let's go to 36.

      The United States asked you about a MAC-type firearm in this picture, correct?

A.    That's correct.

Q.    Did you examine it?

A.    I examined four MAC-type firearms.  I don't know exactly which four from the --

Q.    You don't even know if the one in the picture, whether -- they took some, but you don't know if they took that one?

A.    They took the open-bolt MACs.  I'm unaware if there's closed-bolt MACs present.

Q.    Client's not charged with that, correct?

A.    Correct.

Q.    You also said something about there being a Uzi

semiautomatic in this picture somewhere, correct?

A.    Yes.

Q.    Client's not charged with it?

A.    That's correct.

Q.    Did you examine it?

A.    I did.

Q.    All right.  Exhibit 37.  You talked about the two rifle -- or two guns, get my terms right here -- that are to the right of the dog.  Did you examine those?

A.    I did not.

Q.    So they weren't seized to your knowledge?

A.    My knowledge, no.

Q.    If they were, they didn't send them to you to examine, correct?

A.    Correct.

Q.    My client's not charged with them?

A.    Correct.

Q.    Okay.  Let's go to 38.

You were shown this picture and commented on some items that were in there, correct?

A.    That's correct.

Q.    And did you examine any of those items?

A.    I did.

Q.    The black gun that's laying on the white box or the white -- what's that?

*J. Bodell - Cross - Woodward*                                    52

A.    I examined the M60 machine gun receivers.

Q.    My client's not charged with them?

A.    Correct.

Q.    Well, so let me make sure, the weapon -- the gun, I don't want to use the wrong term -- that's laying on that notebook, did you examine that?

A.    If that's one of the four MAC machine guns I examined.

Q.    My client's not charged with it?

A.    Correct.

Q.    Okay.  Let's go to 39.

      You were asked about that.  Did you examine that?

A.    I did.

Q.    Is my client charged with it?

A.    No.

Q.    Exhibit 40.  That was sent to you to be examined?

A.    That's correct, I examined.

Q.    Is my client charged with it?

A.    No.

Q.    Exhibit 41.  Did you examine that?

A.    I did.

Q.    Is my client charged with it?

A.    No.

Q.    Exhibit 42.  That's one of those -- that's something that's just stuck together that's cut, we just can't see the cut that good on the picture, right?

*J. Bodell - Cross - Woodward*                                    53

A.    That's correct.

Q.    Did you examine it?

A.    I did.

Q.    Is my client charged with it?

A.    No.

Q.    43.  Again, that, that's a receiver of something, right?

A.    Yes.  It's a PPSH41 machine gun receiver.

Q.    Okay.  It's cut in half or cut in two parts?

A.    Yes.

Q.    My client's not charged with it, correct?

A.    Correct.

Q.    Okay.  44.  You talked about some device in this picture.
Did you examine it or did you just see the picture?

A.    I examined that.

Q.    And is my client charged with it?

A.    No.

Q.    Okay.  45.

    The items of interest that you pointed out when you had
this, is my client charged with those?

A.    No.

Q.    Did you examine them?

A.    I examined the machine gun receiver, not the parts on the
bottom.

Q.    Okay.  Do you know if the parts on the bottom were even
seized by the ATF?

A.    I don't know that.

Q.    You don't know.  Okay.

All right.  Let's go to 46, those books.

You looked at those books and you said they were catalogs, I think?  Diagrams and catalogs?

A.    User's manual.  I think it was receiver plans, diagrams.

Q.    And my client's not charged with having them, are they?

A.    No.

Q.    Let me ask you, when you were in your business building guns and being a gunsmith and doing that work, did you have various parts catalogs and diagrams and blueprints of different weapons?

A.    I did.

Q.    Had a lot of them, probably?

A.    Quite a few.

Q.    And you probably had some for weapons you built and some for weapons you didn't build?

A.    I had ones for weapons that I built, and other blueprints would have been for tools that I made.

Q.    Let's go to Exhibit 47.

Same question:  Those were some blueprints or schematics that you looked at?

A.    Parts diagrams, parts lists and a parts catalog.

Q.    And you didn't examine -- just to be fair, all the paperwork that you were shown, you didn't have that up in the

*J. Bodell - Cross - Woodward*                                              55

lab to examine, you were just shown that here today?

A.   I never had those documents in Martinsburg.

Q.   My client's not charged with anything related to these documents that you know of, is he?

A.   Not that I'm aware of.

Q.   Let's go to 48.

You looked at that and they blew it up on the side there. That's some pictures with, you know, where to drill a hole for something.  You examined that here today or saw that here today, correct?

A.   Yes.

Q.   And you -- as far as you know, my client's not charged with anything related to that or building anything like that, is he?

A.   Correct.

Q.   All right.  49.

And this is a, this is a big multipage document.  You don't need to pull it out.  That's the one you remember, you said it was military paperwork, or military it looked like, and it had a bunch of specifications.  The jury will have it.  It's a lot of pages.  This is just the cover page.  You saw that here on the stand; you didn't have it in West Virginia?

A.   Correct.

Q.   So far as you know, my client's not charged with possessing anything like that or building anything like that in this case?

A.   Correct.

Q.    Okay.  50.

This is the letter that you were shown from overseas somewhere, and you were asked some questions about importation. You have no information that my client ever imported any weapons?

A.    No, I only examined the evidence that I received as its received.

Q.    Right.  But -- well, the government asked you, they must have thought it was important to ask you about this exhibit or they wouldn't have, so now I'm going to ask you about it.  You don't have any information that my client imported any weapons, correct?

A.    I do not.

Q.    You don't have any information he ever had a burner phone to communicate with anybody, do you?

A.    I do not.

Q.    You don't know any -- you don't know if he ever responded to this, didn't respond, you don't know anything about it other than they showed it to you on the stand today?

A.    Correct.

Q.    And they asked you what you believe some of the abbreviations mean, that's it?

A.    Yes.

Q.    Okay.  Let's now go to 51.

The government showed you this exhibit.  Those are machine

gun shields, correct?

A.    Yes.

Q.    Okay.  Do you know if the ATF seized those or just left them at my client's house?

A.    I'm unaware.

Q.    You didn't have them in West Virginia?

A.    I did not.

Q.    And he's not charged with them?

A.    No.

Q.    Okay.  52.  We can stipulate that.  That's just -- go to 53.

    You were asked about these and you said you couldn't tell what they were or whether they were explosive or inert?

A.    I did not examine those items.

Q.    Do you know if the ATF even seized them or did they just leave them there on the garage floor?

A.    I don't know.  I wasn't at the search warrant.

Q.    My client, so far as you know is not charged with them?

A.    Correct.

Q.    Sir, I understand, the United States asked you about these things, that's why I'm following up, okay?

    Let's go to 52 -- or excuse me, 54.

    They didn't show you that.  We can skip that one.

    Next one was 57, I believe.  Let's go to 57.  Showed you those.

*J. Bodell - Cross - Woodward*                                            58

You said those are some sort of machine gun parts?

A.    That's correct.

Q.    Those are the kind of machine gun parts that the ATF doesn't regulate, right?

A.    Correct.

Q.    Okay.  And do you know if the ATF even seized those?

A.    I don't know that.

Q.    You didn't examine them?

A.    I did not examine those.

Q.    And so as far as you know, my client's not charged with anything related to having those parts?

A.    No.

Q.    Okay.  58.  You examined this?

A.    I did.

Q.    Okay.  My client's not charged with it, correct?

A.    Correct.

Q.    59.  Did you examine these?

A.    I did.

Q.    Is my client charged with them?

A.    He is not.

Q.    All right.  60.  These machine gun receiver flats as you called 'em, did you have those in West Virginia or did you just see them in this picture?

A.    I did not have them in West Virginia, just the photographs.

Q.    Do you know if the ATF left them there or took them?

*J. Bodell - Cross - Woodward*    59

A.    I'm unaware.

Q.    You don't know.

So as far as you know, my client's not charged with anything related to them?

A.    Correct.

Q.    61.  This was another drawer in the tool box that you were asked to look at, correct?

A.    Yes.

Q.    And same thing:  Did you have it in West Virginia?

A.    I did not.

Q.    Did you -- so you didn't examine it other than seeing the picture?

A.    Correct.

Q.    Okay.  And my client's not charged with anything related to having those parts?

A.    Correct.

Q.    62.  Again, this is a picture you were shown.  Did you have any of these things in West Virginia that's in this picture?

A.    I did not.

Q.    The thing that you said was a partially formed MAC receiver.  Do you know if the ATF seized that or left it at his house?

A.    I'm unaware.

Q.    Okay.  But my client's not charged with anything related to that, correct?

A.    Correct.

MR. WOODWARD:  May I have one moment, Your Honor?

THE COURT:  You may.

MR. WOODWARD:  Thank you, Judge.

THE COURT:  Can you wipe down for me, Mr. Woodward?

MR. WOODWARD:  Yes, ma'am.

THE COURT:  Ms. Liu, any redirect?

MS. LIU:  Yes, Your Honor.

THE COURT:  All right, ma'am.

REDIRECT EXAMINATION

BY MS. LIU:

Q.    All right.  Just to clarify for the jury, you don't make any charging decisions, right?

A.    Correct.  I'm not a criminal investigator.

Q.    All right.  So I want to just turn to the charged weapons in the case.

You were asked a lot of questions about putting together the assembly so you could fire the RPG-7s.  How long approximately did it take for you to put that together?

A.    It took less than 15 minutes to put the parts in to be able to test fire it.

Q.    So it was ready restorable?

A.    Yeah.  The -- I guess to explain it, like, the weapon didn't need to fire to be a destructive device; the tube itself is a weapon, and it wasn't destroyed, so it never ceased to be a

destructive device.

Q.   And I think you did mention that on cross, that the -- it doesn't matter whether it fires or not; is that right?

A.   Correct.  If it's missing some component parts, it's not -- it wasn't relevant to the classification as a destructive device.

Q.   And you also mentioned on cross that the test firing wasn't even needed in your examination?

A.   No.  It was more of a demonstration, to demonstrate the weapon's functional and, you know, it can be shot.  It's not destroyed.  There's various things that need to be done to a weapon to destroy it, and it wasn't done.

Q.   And for the RPG-7s, what needs to be done to destroy that?

A.   Under the law, to destroy a firearm, if it's destroyed it ceases to be what it is.  For a firearm to be destroyed, it needs to be completely crushed, melted, smelted or shredded.  If somebody does not have the means to be able to completely crush, melt or shred a firearm, they can contact our office and, on an individual basis, we will issue alternate destruction diagrams. We're authorized that power.  And for the RPG-7, to destroy an RPG-7, the firing pin channel, that was to be drilled out to a half of an inch, and that hole needs to continue to the top of the tube of the receiver.  And in place of those two half-inch holes that you just made, a half-inch steel rod needs to be completely welded in place.  That prohibits even the

*J. Bodell - Redirect - Liu*                                                    62

installation of the munition.

Additionally, a hole equal to or greater than the diameter of the bore must be drilled in the high-pressure area of the RPG-7.  It's typically no more than six inches rear of the rear grip on the bottom or the left side.

Q.  And you mentioned that hole, how big does that hole need to be?

A.  Equal to or greater than the diameter of the bore.  In this case, that's 40mms approximately, so 1.6 inches, roughly.

Q.  And I think you mentioned this on cross, but how big was that hole that was in the RPG-7?

A.  0.39 inches.

Q.  So not quite as big as needed?

A.  No.  Not nearly big enough.

And also the other part of the destruction wasn't completed was the obstruction welded through the firing pin channel.  Both of those must be present for the weapon to be destroyed.

MS. LIU:  And if we can pull up Exhibit 121?  I believe these findings are on Page 7 of that report.

Can you highlight it?  The bottom part.

BY MS. LIU:

Q.  All right.  So this is where you've documented your findings; is that right, about the lack of destruction?

A.  Correct.

MS. LIU:  I have no further questions, Your Honor.

Paul L. McManus, RMR, FCRR Official Court Reporter

*J. Bodell - Recross - Woodward*                                       63

THE COURT:  Okay.  Any follow-up?

MR. WOODWARD:  Just a couple follow-up.

THE COURT:  Can you wipe down, please, Ms. Liu?

MS. LIU:  Yes, Your Honor.

THE COURT:  Thank you.

RECROSS-EXAMINATION

BY MR. WOODWARD:

Q.   Just a couple things, sir.

You said, I think -- and if I wrote it down wrong you please correct me -- you said it doesn't matter whether it'll fire or not?

A.   No.  In my report I mention that it's a demonstration of the functionality of the weapon.

Q.   So why did you do it?

A.   To demonstrate the weapon.

Q.   But what you had wouldn't fire till you added some parts to it, correct?  What you got wouldn't have fired until you had added five things we went over on direct?

A.   Correct.  Unless I used an alternative means to fire it.

Q.   So what you fired in that demonstration of the RPG was what it was after you added those parts, correct?

A.   Can you, can you --

Q.   Yes, sir.

A.   -- repeat that?

Q.   Maybe I'm asking unclear questions.

Paul L. McManus, RMR, FCRR Official Court Reporter

*J. Bodell - Recross - Woodward*                                          64

The exhibit, it's either -- I think it's 71 -- it might be 70 -- the jury will have it, showing you shooting the RPG, that's after you added those component parts that we talked about?

A.   Yes.  I put the component parts in the firing mechanism to demonstrate the weapon functioning as its designed to function.

Q.   And you say to destroy a firearm you have to crush, melt, or shred it?

A.   Completely.

Q.   Okay.  Completely.

MR. WOODWARD:  Thank you, Judge.  That's all the questions I have.

THE COURT:  All right.  Can you wipe down for me, Mr. Woodward?

And I'm assuming no further follow-up, Ms. Liu?

MS. LIU:  No, Your Honor.

THE COURT:  Okay.  All right, sir, you can -- and he can be excused, Ms. Liu?

MS. LIU:  Your Honor, we may need to recall him.

THE COURT:  Okay.  So you're going to have to stick around, but please don't discuss your testimony with anybody. Have a good rest of your day.

THE WITNESS:  Thank you, Your Honor.

(Excerpt concludes.)

*CERTIFICATION*

Paul L. McManus, RMR, FCRR Official Court Reporter

65

*I certify that the foregoing is a true and correct*

*excerpt of proceedings held in the above-entitled matter.*


_____

Paul L. McManus, RMR, FCRR


_____

Date