**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 2:22-CR-47** |
| | ) | |
| **PATRICK TATE ADAMIAK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING FACTORS

The United States of America, represented by Jessica D. Aber, United States Attorney, and Victoria Liu, Special Assistant United States Attorney, offers this position paper regarding the sentencing factors stated in 18 U.S.C. §3553(a).  The government objects to the following in the Presentence Investigation Report (PSR):

1. Calculation of the number of firearms involved in the offense.  The government contends that Probation did not include additional firearms that the Confidential Informant (CI) bought prior to receiving the charged complete machinegun and did not include illegally possessed firearms found within the defendant's residence during the execution of the search warrant.

2. Non-application of the obstruction of justice adjustment.  After he was convicted, the defendant directed his friend, Adam Myers, to aid him in specific ways.  One of those ways was to put out the names of any witnesses that testified against him.  As a result, Mr. Myers published the name of the CI, as well as specifically calling out a Master Chief in the Navy who testified for the government.  Both witnesses learned of these actions and were specifically harmed financially and/or emotionally as a result.

3.   Defense's objections.  The government agrees that the shotgun should not be counted as an illegal firearm.  At trial, the government presented Government Trial Exhibit (Gov. Ex.) 75, which lists the shotgun as a registered weapon.  It is the "any other weapon" by Coastal Gun Works.  The government disagrees with the remainder of defense's objections and intends to respond after reviewing defense's position paper by or on Tuesday, March 28, 2023.

The government wishes to make the following clarifications to the additional information in the PSR:

1.  In paragraph 99, it was ADAMIAK who informed Mr. Myers that the conversations were being recorded, not the other way around.

2.  In paragraph 103, ADAMIAK was an Assistant Command Fitness Leader (ACFL) who oversaw Fitchett's physical fitness program.  ADAMIAK elected not to run fitness sessions with Fitchett but would instead meet with Fitchett at regular intervals to complete the form and have Fitchett sign off that he had completed fitness sessions. Eventually, they were unable to meet and ADAMIAK offered to forge Fitchett's signature instead.  Fitchett agreed, and ADAMIAK instructed Fitchett to lie if asked and say that they had completed the sessions.

3.  In paragraph 104, the government notes that the defendant was also operating his firearms business during the COVID restrictions.  Neither of these businesses was reported to the Navy.

4.  In paragraph 106, in addition to Nazi memorabilia, the government presented Probation with statements from the defendant espousing that he was pro-right wing, pro-

communist.  He expressed the same to "Diego," the Russian contact named in paragraph 105.  In combination, the defendant's expression of such views is a violation of Navy regulations.

As the PSR states, the current advisory range under the U.S. Sentencing Guidelines (U.S.S.G. or Guidelines) are restricted at 600 months' imprisonment.  Based on the nature of the offense and the defendant's characteristics, the United States respectfully requests that the Court impose a below-Guidelines sentence of 360 months and three years of supervised release.  This is sufficient, but not greater than necessary, to accomplish the goals set forth in 18 U.S.C. §3553(a).

## I. PROCEDURAL BACKGROUND

On April 8, 2022, PATRICK TATE ADAMIAK (hereinafter ADAMIAK) was charged by criminal complaint and arrested pursuant to a federal arrest warrant.  ECF Nos. 1, 3, 6.  On May 4, 2022, an Indictment was returned and filed.  ECF No. 15.  On June 23, 2022, the Superseding Indictment was returned and filed, charging the defendant with five counts: (1) Receive and Possess an Unregistered Firearm, namely a PPSH machinegun; (2) Unlawful Possession and Transfer of a Machinegun, that is a PPSH machinegun; (3) Receive and Possess an Unregistered Destructive Device, namely a M79, 40 mm grenade launcher; (4) Receive and Possess an Unregistered Destructive Device, namely a M203, 40 mm grenade launcher; and (5) Receive and Possess an Unregistered Destructive Device, namely two RPG-7 variant recoilless antitank projectors.  ECF No. 28.

On October 21, 2022, after a four-day jury trial, ADAMIAK was convicted on all counts of the Superseding Indictment.  ECF No. 64.  The Presentence Investigation Report and its

3

addendum were then filed on February 17, 2023 and March 24, 2023, respectively.  ECF Nos. 69, 72.

## II. FACTUAL BACKGROUND

As this Court is well aware from the evidence presented at trial, from on or about October 2021 through on or about April 2022, Special Agents with the Alcohol, Tobacco, Firearms, and Explosives Agency (ATF) were investigating the sale and receipt of illegal machineguns by the defendant, ADAMIAK, pursuant to information produced by a CI.  *See* PSR ¶¶ 5, 6.  Throughout the investigation's time period, the CI purchased a total of seven (7) single saw cut machinegun receivers that were readily restorable to full function, and one entire machinegun, the PPSH machinegun charged in the Superseding Indictment. *See* PSR ¶¶ 6–24.

Over the course of the CI's conversations with the defendant, the defendant made numerous mentions of other sales he had completed, including the following, non-exhaustive statements that are noted in the PSR:

- "[H]e just sold three single-cut receivers to an individual that lives out of state" PSR ¶ 6.

- "He stated the suspected machinegun receivers sold faster than he could produce them." *Id.*

- "ADAMIAK replied that he no longer had a M1" PSR ¶ 18.

On April 8, 2022, search warrants were executed at the defendant's properties, resulting in the recovery of many illegal firearms—including additional machineguns—relevant documents, and two wooden crates that were government property. *See* PSR ¶¶ 26–28.  At the first residence, the defendant possessed potential live grenades, which necessitated further expenditure of resources to clear.  *See* PSR ¶ 27.  When executing the warrant for the second

property, Special Agents witnessed ADAMIAK mailing out numerous packages and found additional packages ready to be mailed in his vehicle. *See* PSR ¶ 28. The defendant was detained in a traffic stop. *See id.*

Among the documents seized from the defendant's properties were invoices and schematics that detailed the defendant's illegal manufacturing of machinegun receivers. *See* PSR ¶¶ 29–31. The defendant was drawing the specific items he wished to be mass-produced by Advanced Machine and Tooling, Inc., sending those designs to the company, and ultimately received at least 977 firearms through these transactions. *See* PSR ¶¶ 30, 31. These invoices are further supported by pictures taken of these items during the search warrant, which were Gov. Exs. 60–62, as well as photographs that the defendant appended to the message referenced in PSR ¶ 12. In these photographs, boxes that were nearly empty at the time of the search warrant execution appear full. *See* Position on Sentencing Exhibit (POS Ex.) 1.

The remaining charged destructive devices were also found during execution of the search warrant. *See* PSR ¶¶ 32–35. At trial, government expert ATF Firearms Enforcement Officer (FEO) Jeff Bodell testified that all the destructive devices were readily restorable to full function, noting that he had test fired them. FEO Bodell explained that because of how much damage each of these weapons would inflict if test fired with the corresponding grenade or rocket, he had found an alternative way to test fire the destructive devices.

The defendant's phone was also seized, and a phone extraction completed. The phone contained numerous conversations between the defendant and both his buyers and sellers. The defendant's conversations with certain individuals revealed additional facts:

- The defendant and "Chief King": In 2016, Chief King straw purchased 21 AR-15 receivers for the defendant, for which the defendant paid Chief King $1890. *See* POS Exs. 2, 3. From February 2021–July 2021, Chief King stole items from the Navy and sold them to the defendant. *See* POS Ex 4. In both instances, the defendant's intent was to resell to third party purchasers. *See* POS Exs. 5, 6.

- The defendant and "Diego": the defendant used Diego, who was in Russia, to source machineguns and firearms parts for his business. *See* POS Ex. 7. He also alludes to his pro-communist views and mentions four other overseas sources for firearms in his conversation with Diego. *See id.* at 175.

- The defendant and "Steve Barnett": a friend of Steve Barnett left a backpack on the defendant's property and, after pulling out the items inside, the defendant proclaimed, "Your friend is my kind of guy..he had a ton of right wing extremist and communist shit in there" then "Lol I need to meet this guy" and "I legit wanted to keep his shit lol." POS Ex. 8.

The government also seized email communications from the defendant pursuant to a search warrant. In one email, on April 14, 2021, the defendant falsely purports to be representing the United States Navy when seeking pricing on select-fire trigger groups. *See* PSR ¶ 97. He later brags about this misrepresentation to "Adrian 007." *See* POS Ex. 5 at 446.

At trial, several other facts came to light. A Federal Firearms Licensee (FFL) witness testified that the defendant had falsified records that connected the defendant's business to the FFL. A Navy Master Chief confirmed that the crate found on the defendant's property belonged

to the Navy.  The government also entered Gov. Ex. 50, evidence that the defendant had an overseas source for firearms in Slovenia.

After the trial, where the defendant was convicted of all counts and remanded into the custody of the United States Marshals, the defendant primarily acted through Mr. Myers.  Mr. Myers then acted on behalf of the defendant to complete the tasks outlined in PSR ¶¶ 39 and 100.  Mr. Myers also deceived Western Tidewater Regional Jail to have an unrecorded conversation with the defendant on November 22, 2022.  *See* PSR ¶ 99.  As a result of the defendant's actions through Mr. Myers[1], the witnesses were financially and/or emotionally harmed.[2]

### III.  STANDARDS GOVERNING SENTENCING

#### A.  General Standards

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the Sentencing Guidelines purely advisory, but emphasized that a sentencing Court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision.  *Id.* at 264.  The Supreme Court reaffirmed this principle in *United States v. Kimbrough*, 552 S. Ct. 85 (2007), emphasizing that "the Guidelines, formerly mandatory, now serve as one factor among several Courts must consider in determining an appropriate sentence."  *Id.* at 564.  Finally, in *Gall v. United States*, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing Court should calculate the Sentencing Guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider

---

[1] The government also notes that any friendship between Mr. Myers, a Navy Chief, and the defendant, a Petty Officer First Class, is a violation of the Navy regulations against fraternization.

[2] To the extent necessary, the government will present evidence at sentencing necessary to support any facts not presented at trial and to support the government's objections to the PSR.

all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. *Id.* at 596-97. The *Gall* Court further instructed that, in the event that the sentencing Court decides to impose a variance sentence, the Court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (noting that a "major departure should be supported by a more significant justification than a minor one.").

"[I]n imposing a sentence after *Booker*, the district Court must engage in a multi-step process. First, the Court must correctly determine, after making appropriate findings of fact, the applicable guideline range." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). "Next, the Court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'" *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)). In making this determination:

> a sentencing Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and the need "to reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," "protect the public," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)).

Importantly, the Supreme Court has recognized that a party's argument for a sentence outside the calculated guideline range may "take either of two forms." *Rita v. United States,* 551 U.S. 338, 344, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). A party may "argue within the Guidelines' framework, for a departure," *Id*. (emphasis in original), or a party may "argue that, independent of the Guidelines, application of the factors set forth in 18 U.S.C. § 3553(a) warrants a [different variant] sentence." *Id*.

8

Applying these standards, the Fourth Circuit has concluded that a sentencing Court must: "(1) properly calculate the Guideline range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence." *United States v. Simmons*, 269 Fed. Appx. 272 at *1 (4th Cir. 2008) (*citing United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007)).

### B.  Application of Obstruction of Justice Adjustment

U.S.S.G. § 3C1.1 provides for a 2-level sentencing enhancement when a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and "the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. Comments to the Guidelines recognize that "[o]bstructive conduct can vary widely in nature, degree of planning, and seriousness," and "is not subject to precise definition." *Id*. cmt. 3.  Examples of covered obstructive conduct include " threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." *Id*. cmt. 4(A).

After he was convicted, ADAMIAK directed his friend, Adam Myers, to aid him in specific ways.  One of those ways was to publicly put out the names of any witnesses that testified against him.  As a result, Mr. Myers published the name of the CI, as well as specifically calling out a Master Chief in the Navy who testified for the government.  The government was notified of the impact on both witnesses through each witness's independent discovery of the publications of their names.  The CI reported to the case agent that he was receiving concerning

messages asking about whether he was working with the government from his regular customers at his business. These customers then stated that they would no longer do business with the CI given the information that the defendant had publicized. The Master Chief was alarmed enough that he notified his command's legal team, and the Naval Criminal Investigative Service was notified. Both witnesses therefore learned of these actions and were specifically harmed financially and/or emotionally as a result.

The Fourth Circuit has explained that an obstruction of justice adjustment applies when the person who is the subject of the threat learns of the threat. *See United States v. Brooks*, 957 F.2d 1138 (4th Cir. 1992). In *Brooks*, the Court declined to apply an adjustment where the defendant made a threat about someone outside of that person's presence and the subject of the threat never learned of the threat. *See id.* at 1149–50. The Court explained that an obstruction of justice enhancement is justified when a convicted defendant "threatens, intimidates, or otherwise unlawfully influences a co-defendant, witness, or juror, directly or indirectly, or attempts to do so." *Id.* at 1149 (quoting U.S.S.G. § 3C1.1 comment n.3). At a minimum, that means the action occurs in the subject's presence or "in circumstances in which there is some likelihood" that the subject will learn of the action. *Id.* at 1149–50.

Here, the defendant's actions through Mr. Myers clearly constitute a scenario where the witnesses would discover that they are being unlawfully influenced. A public Facebook post and a public YouTube video makes discovery of the defendant's intentions easy. And in the instant case, the witnesses did find out about the posts. The subsequent effect on these witnesses and their well being is further support that the obstruction of justice enhancement should apply. The case agent, Special Agent Will Hairston, intends to testify regarding the CI's reaction, and

Master Chief may testify to his own reaction at the sentencing hearing. The defendant's actions here are even more egregious because he could reasonably believe that trial witnesses could be recalled for testimony at sentencing when he decided to retaliate against them.

### C. Calculation of the Number of Firearms

In paragraph 25 of the PSR, it states, "[i]n an attempt to avoid the possibility of double counting, the defendant has not been attributed with the firearms sold to the CI." However there is no other counting that considers the five (5) PPS-43 machinegun receivers, the RPD machinegun receiver, or the PPSH-41 machinegun receiver that were all received prior to the charged machinegun, which included all of the unregulated gun parts in addition to the receiver. In total, 7 additional firearms should be included off of the buys alone.

In addition, the government provided the attached supplemental expert report to defense pertaining to the firearms found in the search warrant. *See* POS Ex. 9. These firearms were mentioned during FEO Bodell's testimony. The defendant possessed 23 illegal firearms included in this report that should be included in the total number of firearms.

### IV. FACTORS UNDER 18 U.S.C. § 3553(a)

Under 18 U.S.C. § 3553(a), when imposing a sentence, the Court must consider (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, (3) the need for the sentence imposed to promote the goals of sentencing, (4) the kinds of sentences available, (5) the sentencing guideline range, (6) any pertinent policy statement issued by the Sentencing Commission, (7) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (8) the need to provide restitution to any victims of the offense.

### A.      Nature and Circumstances of the Offense

The nature and circumstances of the defendant's crime demonstrate that the defendant had no desperate need that compelled him to break the law in this manner.  The defendant already had a 10-year career in the Navy and received full benefits from that career.  He not only wanted to join the Navy, but he was also successful at his job and on track to continue promoting.  The defendant clearly had a deep knowledge of firearms and force protection that were of value to the Navy.  But instead of choosing what is honorable and right, the defendant chose to make more money at any cost, including by ignoring all the laws governing firearms and selling items he knew were stolen from the Navy.  His lack of respect for the Navy and our nation's security is appalling, to say the least.

### B.      Defendant's History and Characteristics

The defendant's history and characteristics show that he grew up in poverty but elected to serve his country in the Navy once he reached adulthood.  He is generally in good health and, through the Navy, received many years of specialized training and multiple higher education degrees.

But the defendant's service in the Navy was marked by a continued lack of respect for the Navy's regulations.  From at least 2016 the defendant has prioritized himself over his service to his country by engaging in criminal and military misconduct of varying degrees.  To further the offense conduct, the defendant has compromised the quality of his Navy service.  That this misconduct was not discovered until the present charges were filed is not relevant.

And, even while serving in the military, the defendant was further degrading that institution and this country by his support of communism.  He openly admitted to Steve Barnett

12

that he considered his kind of guy to be a right-wing extremist and a communist, and, even more alarming, admitted these sympathies to "Diego," a Russian. The defendant holds a security clearance and would have been under investigation to receive that security clearance shortly before he was arrested. His nondisclosure of his numerous foreign contacts and communist sympathies further demonstrates his callous disregard for our nation's security from domestic and foreign threats.

### C. Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment for the Offense

These factors in combination with deterrence weigh the most heavily in favor of the 360-month recommendation. The defendant had his firearms business since late 2017, according to paragraph 87 of the PSR. The number of firearms in the PSR calculation (about 1,000) does not consider anything that was not sold or seized before 2021. The defendant stated that he made a $20,000 profit in 2021. *See* PSR ¶ 87. That number alone demonstrates how successful the defendant was at putting firearms into the hands of people through illegal means before law enforcement was even aware of his misconduct. It is reasonable to infer that the defendant has put thousands of unregistered firearms on the street with no way for anyone to track them. That the majority of these firearms are *machineguns* further highlights the dangerousness of the offense conduct.

The defendant has also repeatedly denied wrongdoing and fought any accusations and his conviction. He has done so publicly and raised a significant amount of money in support of his position. A sentence in this case should send a clear message that firearm regulations should be respected, and such a flagrant violator of the law will be appropriately punished.

**D.      Adequate Deterrence to Criminal Conduct**

Likewise, a sentence of 360 months will be severe enough to adequately deter others from committing similar crimes.  The government also believes that this length of time will specifically deter the defendant without depriving him of the opportunity to return to society as a law-abiding citizen.

**E.      Protect the Public from Further Crimes of the Defendant**

Although it is impossible at this junction to know the full effect of the defendant's crimes, the severity of a 360-month sentence in combination with the deterrent effect of such a sentence will produce a chilling effect on flagrant violations of firearms laws.  Based on the defendant's continued defiance and refusal to accept responsibility, especially, it is a concern that when the defendant is released, he may go right back to what he still thinks was a respectable, lawful thing to do.  Protecting the public from someone with the defendant's mindset is of utmost importance, in particular in today's rising tide of gun violence.

**F.      Need to Avoid Unwanted Sentencing Disparities**

The government believes that this case is so extraordinary and unique that there is no similar conduct that is as egregious as the defendant's offense conduct in other cases.  For this reason, despite recommending a downward variance from the Sentencing Guidelines, the government believes that 360 months of incarceration is necessary due to the severity of the offenses for which the defendant has been convicted.  In addition, the government believes three years of supervised release will ensure that the defendant will not commit further crimes upon release.

## VI.  CONCLUSION

The government maintains its stated objections and intends to respond to defense's objections by or on Tuesday, March 28, 2023.  And, based on the above, the government asks the Court to impose a sentence of 360 months incarceration and three (3) years of supervised release.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
Victoria Liu
Special Assistant United States Attorney
New York State Bar No. 5431549
United States Attorney's Office
World Trade Center, Suite 8000
101 W. Main Street
Norfolk, Virginia 23510
Office Number - 757-441-6331
E-Mail Address – victoria.liu@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of March, 2023, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of

such filing (NEF) to the following:

David Michael Good
David Michael Good PC
780 Lynnhaven Pkwy
Suite 400
Virginia Beach, VA 23452
(757) 306-1331
Email: dgood@dgoodlaw.com

Lawrence Hunter Woodward, Jr.
Ruloff Swain Haddad Morecock Talbert & Woodward, PC
317 30th Street
Virginia Beach, VA 23451
757-671-6047
Email: lwoodward@srgslaw.com

I further certify that on this 24th day of March, 2023, I caused a true and correct copy of

the foregoing Position of the United States with Respect to Sentencing Factors to be e-mailed to

the following:

Joshua Coleman
Senior United States Probation Officer
United States Probation Office
600 Granby Street, Suite 230
Norfolk, Virginia 23510

_____/s/_____
Victoria Liu
Special Assistant United States Attorney
New York State Bar No. 5431549
United States Attorney's Office
World Trade Center, Suite 8000
101 W. Main Street
Norfolk, Virginia 23510

16

Office Number - 757-441-6331
E-Mail Address – victoria.liu@usdoj.gov

17